IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANTOINE CHANCE | * | |
| Plaintiff, | * | |
| | * | Civil No. JFM 06–1655 |
| v. | * | |
| | * | |
| MAYOR AND CITY COUNCIL | * | |
| OF BALTIMORE | * | |
| Defendants. | * | |
| | ***** | |

**MEMORANDUM OPINION**

Claiming that the defendants, the Mayor and City Council of Baltimore ("City"), discriminated against him on the basis of actual and perceived disability, failed to provide him with reasonable accommodation, and failed to engage him in a required interactive process, the plaintiff Antoine Chance ("Chance") alleges violations of The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq*, and The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et. seq*. Chance seeks declaratory, injunctive, and equitable relief as well as compensatory damages, costs, and attorney's fees. (Compl. ¶ 1.)

The City has moved for summary judgment on the grounds that Chance's claims are time-barred and that he has failed to make out a *prima facie* case under either the ADA or the Rehabilitation Act. (Def.'s Mot. for Summ. J. at 1.) Chance opposes the motion and has cross-moved for summary judgment. (Pl.'s Cross-Mot. at 1–2.)

I conclude that Chance has failed to present sufficient evidence that might support a finding that he could perform the essential functions of the jobs in question, with or without accommodation. Thus, Chance is not a qualified individual with a disability and not subject to the protections afforded by the ADA and the Rehabilitation Act. Accordingly, the City's motion for summary judgment is granted, and Chance's cross-motion denied.

## I.  FACTS

Chance began his employment with the Baltimore City Department of Public Works in 1988 and worked as a mechanic until suffering a back injury in 1991.  (Compl. ¶¶ 13–14.)  At that time, he spent eighteen months performing desk work, until being placed in an "off work status" from March 1993 until January 1995.  (*Id.* ¶ 15.)  In January 1995, Chance returned to his job and worked without incident until suffering another injury in December 2002.  (*Id.* ¶¶ 15–17.)  For over a year after this second injury, Chance did not work.  (*Id.*)  In January 2003, he returned to work for the City, operating a fuel station.  (*Id.*)

On March 30, 2004, following a medical evaluation that concluded Chance's impairment was permanent, the City sent Chance a letter informing him that the City believed he was unable to "perform the essential duties of [the mechanic] position."  (Def.'s Ex. G at CXA0429.)  This letter gave Chance four options "to resolve [his] work status."  (*Id.*)  First, Chance could submit a proposed list of accommodations that would allow him to perform his job's essential functions.  (*Id.*)  Second, Chance could identify vacant positions within the City for which he was qualified and physically able to perform.  (*Id.*)  Third, Chance could resign.  (*Id.*)  Fourth, Chance could apply for disability retirement benefits.  (*Id.* at CXA0430.)  The letter further instructed Chance that he had two weeks, specifically until April 13, 2004, to inform the City which option he selected.  (*Id.*)  Then, in bold letters, the letter stated that if Chance failed to respond by the deadline, he would be recommended for termination.  (*Id.*)  Finally, the letter outlined the steps that Chance should take if he decided to pursue option two, namely to seek other vacant positions within the City.  (*Id.*)

It is undisputed that Chance failed to respond to this letter in a timely fashion.  (*See* Pl.'s

Rep. Mem. at 13.) Subsequently, by letter of April 16, 2004, Chance was informed that he was being recommended for termination because of his inability "to perform the essential duties of [his] position, Motor Equipment Mechanic." (Def.'s Ex. G at CXA0426.) The letter further stated that Chance should attend a pre-termination conference on April 26, 2004. (*Id.*) At this conference, Chance told the City he was interested in either transferring to the positions of Automotive Maintenance Worker or Laborer, or retiring with disability benefits.[1] (Def.'s Ex. J ¶ 10; Pl.'s Ex. 28 ¶ 5.)

Chance further claims that the City did not take any steps to assist him in these applications and transfer proposals. (Pl.'s Ex. 28 ¶ 6.) However, the City has put forth unchallenged evidence that, in response to Chance's interest in the Automotive Maintenance Worker and Laborer positions, it hired a doctor to perform a medical review of Chance's suitability for those jobs. (Def.'s Ex. J ¶ 10; Def.'s Ex. G at CXB0254.) That review, conducted by Dr. James Levy of Mercy Medical Center, determined that "due to chronic back problems and periodic leg pain . . . this fellow is unfortunately *unable to perform either job* . . ." (*Id.* (emphasis supplied).)

In July 2004, Chance's application for disability retirement benefits was granted. (Def.'s Ex. J ¶ 14.) Subsequently, on August 9, 2004, the City sent a letter to Chance informing him, once again, that it "has been recommended that your employment with the City . . . be terminated

---

[1] Chance claims that he also applied for the position of Fleet Quality Control Analyst, but this claim is misleading. From his own evidence, it is clear that Chance applied for the position in August 2002, before the second injury and well in advance of the events underlying this lawsuit. (*See* Pl.'s Ex. 9.) Additionally, Chance wrote to Barbara Neale, a human resources employee, in November 2002 (before the second injury) and stated that he was "delaying [his] interest in [the] position." (Pl.'s Ex. 29.) Although in the same letter Chance requested that his name "remain on the eligibility list until [he] can ascertain the needed information," he has submitted no evidence that he reactivated his application after this letter. (*Id.*) Regardless, this application is irrelevant for the purposes of this litigation, which focuses on events occurring after and in light of Chance's second injury in December 2002.

. . ." (Def.'s Ex. G at CXA0410.)  The letter noted that Chance had earlier elected to explore other employment opportunities with the City or to apply for disability retirement benefits.  (*Id.*)  Citing Dr. Levy's conclusion that Chance could not perform the two jobs in which he had expressed interest, as well as Chance's successful application for retirement benefits, the letter set another pre-termination conference for August 11, 2004.  (*Id.*)  Chance did not appear at this conference, allegedly because of car troubles. (Def.'s Ex. J ¶ 15.)  The next day, August 12, 2004, the City sent Chance a termination letter with an effective date of termination of August 16, 2004.  (Def.'s Ex. G at CXA0407.)

On June 10, 2005, Chance filed an "Charge Information Questionnaire" with the Equal Opportunity Employment Commission ("EEOC").  (Pl.'s Ex. 21.)  He filed a Form 5 Charge of Discrimination with the EEOC on October 10, 2005.  (Pl.'s Ex. 22.)  On February 1, 2006, the EEOC issued Chance a notice of right-to-sue letter.  (Pl.'s Ex. 24.)  On May 1, 2006, Chance filed this lawsuit in the Circuit Court for Baltimore City, and in June 2006, the City removed this case to federal court.  Both Chance and the City have filed summary judgment motions that are now ripe for decision.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  A material fact is one that may affect the outcome of the suit.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The facts will be construed in the light most favorable to, and all justifiable inferences will be drawn in favor of, the non-moving party.  *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.  ANALYSIS

The City argues that Chance is not a qualified individual with a disability.  Because Chance has not shown that he could perform the essential functions of his job with or without accommodation, the City's motion for summary judgment is granted and Chance's case will be dismissed.[2]

### A.  The Statutory Framework for ADA and Rehabilitation Act Claims

The Fourth Circuit has held that "[t]o establish a *prima facie* wrongful discharge claim under the ADA, a plaintiff must show that (1) she was a 'qualified individual with a disability'; (2) she was discharged; (3) she was fulfilling her employer's legitimate expectations at the time of discharge; and (4) the circumstances of her discharge raise a reasonable inference of unlawful discrimination."[3]  *Rohan v. Network Presentations, LLC*, 375 F.3d 266, 272 n.9 (4th Cir. 2004).  If a plaintiff fails to show any one of these elements, judgment must be entered against her.  It is

---

[2]  For the purposes of this motion, I will assume (contrary to the City's contention) that Chance filed a timely charge of discrimination with the EEOC. The City argues (1) that Chance's intake questionnaire is substantively insufficient to constitute a "charge" and (2) that even if the questionnaire is sufficient, it was still filed late.  (*See* Def.'s Rep. Mem. at 2–3.)  The City's argument may have some merit.  However, this is a close question that may be answered in part by a forthcoming decision of the Supreme Court.  *See Fed. Express Corp. v. Holowecki*, 06-1322 (cert. granted June 4, 2007) (oral argument transcript *available at* http://www.supremecourtus.gov/oral_arguments/argument_transcripts/06-1322.pdf).  Thus because I can comfortably decide this summary judgment motion on other grounds, I decline to rule on either the questionnaire's sufficiency or the timeliness issue.

[3] To make out a *prima facie* case for a claim of failure to reasonably accommodate or a claim of discrimination under the Rehabilitation Act, a plaintiff must also show that he or she is a qualified individual with a disability.  *See e.g.*, *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 (4th Cir. 2001) (noting that to make out a *prima facie* case of failure to reasonably accommodate, a plaintiff must show "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that *with reasonable accommodation he could perform the essential functions of the position* . . .; and (4) that the employer refused to make such accommodations") (emphasis supplied) (citing *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)); *Doe v. Univ. of Maryland Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir. 1995) (stating that a plaintiff must be a qualified individual with a disability for a Rehabilitation Act claim).  Thus if Chance fails to show that he is a qualified individual, he is not within the class of persons protected by the relevant statutes and *all* his claims should be dismissed.  *See also infra*, note 10 and accompanying text (discussing Chance's failure to engage in interactive process claim).

undisputed that Chance was discharged, and he has thus fulfilled the second prong of the *prima facie* case. However, the City challenges each of the other requirements – and particularly the notion that Chance is a "qualified individual with a disability." 42 U.S.C. § 12112(a).

To meet this requirement, Chance must show both that he has a "disability" and that he is a "qualified individual." *Id.* Chance argues that he has a disability because he either (1) had "a physical or mental impairment that substantially limit[ed]" him in the major life activity of working or, (2) was "regarded as" having such an impairment by the City. 42 U.S.C. §§ 12102(2)(A) & (C). However, even assuming that Chance has a disability,[4] there is no evidence that he was an otherwise "qualified individual" as required by the statute.

To be a "qualified individual" under the ADA, the plaintiff must prove that he was capable of performing the job's "essential functions" with or without a reasonable

---

[4] For the purposes of this opinion, I assume without deciding that Chance is disabled under the statute. It is questionable, however, whether Chance has put forward sufficient evidence to show that he has an actual disability or was regarded by the City as having such a disability. On the one hand, Chance has submitted expert vocational testimony to the effect that his impairment precludes him from 81.2% of actual jobs and 95.4% of job types for which he would otherwise be qualified in the Baltimore-Washington metropolitan area. (Pl.'s Ex. 11 at 8.) *Cf. Taylor v. Fed. Express Corp.*, 429 F.3d 461, 464 (4th Cir. 2005) ("Such vocational evidence is certainly relevant in determining whether an impairment affecting an individual's ability to work constitutes a disability under the ADA."). On the other hand, similar vocational evidence showing a plaintiff was precluded from 57% of jobs titles has been found to be inadequate to show that a plaintiff was substantially limited in the major life activity of working. *Id.* Moreover, the Fourth Circuit has regarded lifting restrictions like Chance's with skepticism. *See Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 349 (4th Cir. 1996) (contending that "as a matter of law . . . a twenty-five pound lifting limitation . . . does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity"); *see also Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 470–71 (4th Cir. 2002) ("In the end, Pollard was left with only the restrictions that she not lift more than twenty-five pounds or bend repetitively. These mild limitations are not significantly restricting."); *but see Taylor*, 429 F.3d at 463 n.2 ("Our opinion in *Williams* should not be read to create a *per se* rule that a twenty-five pound lifting restriction can *never* constitute a disability.") (emphasis in original). Chance's lifting restriction, standing alone, is likely insufficient to survive a summary judgment motion. However, Chance also points to medical restrictions limiting his bending, sitting, stooping, standing, walking, and reaching. (*See* Pl.'s Ex. 11.) Moreover, the EEOC interpretive guidelines clearly support a finding that Chance is disabled. *See* 29 C.F.R. § 1630.2(j) app. ("[A]n individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs. This would be so even if the individual were able to perform jobs in another class, e.g., the class of semi-skilled jobs."). In light of this close legal determination, and because I can grant the City's summary judgment motion on a different basis, I decline to decide the question of whether or not Chance has a disability under the relevant statutes.

accommodation. 42 U.S.C. § 12111(8). In determining what constitutes a job's "essential functions," the ADA mandates that "consideration shall be given to the employer's judgment as to what functions of a job are essential . . ." *Id.* The City asserts that Chance was incapable of performing the essential functions of the job he held or the jobs to which he alleges he sought transfer. (*See* Def.'s Mem. at 12–19.)

To perform a job's essential functions, an employee must be "able to meet all of a program's requirements in spite of his handicap." *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 409 (1979). "A job function is essential if it bear[s] more than a marginal relationship to the job at issue." *Rohan*, 375 F.3d at 279 (internal citations omitted) (alterations in original). The plaintiff "bears the burden of establishing his ability to perform the essential functions of his job with a reasonable accommodation." *Fleetwood v. Hartford Sys., Inc.*, 380 F. Supp. 2d 688, 697 (D. Md. 2005).

Chance forthrightly acknowledges his own physical limitations: "As a result of [my] injuries, I suffered permanent impairments to my lower back . . . for which I was given permanent medical restrictions of not lifting greater than 10 pounds, and restricted periods of standing, walking, bending, stooping and squatting." (Pl.'s Ex. 28 ¶ 3.) Moreover, Chance himself admits that he "is not only *unable to perform all heavy and very heavy labor jobs but all light and all medium jobs as well.*" (Pl.'s Mem. at 25 n.9 (emphasis supplied).) Yet despite these undisputed physical limitations, Chance contends that he is qualified to perform the jobs of Automotive Maintenance Worker and Laborer. (Pl.'s Ex. 28 ¶ 9.)

It is unchallenged that Chance could not perform the essential functions of an automotive

maintenance worker or a laborer *without* accommodation.[5]  Acknowledging as much, Chance asserts that he could have accomplished the essential functions of several jobs if the City had provided him with accommodations.  (Pl.'s Ex. 28 ¶ 9.)  However, as the analysis below demonstrates, Chance has not put forth any evidence that he could have carried out the jobs even with accommodation.  Additionally, the only jobs that Chance might have been able to accomplish are ones in which he never expressed an interest.

### 1. Automotive Maintenance Worker

In an affidavit, Chance claims that he could have performed the essential functions of an automotive maintenance worker if the City had given him a "cart or mechanical lift . . . or assistance from another employee . . ." (*Id.*)  This self-serving declaration is nothing but baseless speculation, and Chance has not submitted sufficient evidence to support the idea that he could perform the Automotive Maintenance Worker job with this, or any, accommodation. *See Tyndall v. Nat'l Educ. Ctrs. of California*, 31 F.3d 209, 213 (4th Cir. 1994) ("Plaintiff bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation."); *see also Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) ("Mere speculation by the non-moving party cannot create a genuine issue of material

---

[5] Consider, for example, the job description for the position of Automotive Maintenance Worker.  That description indicates that the job "requires moderate physical exertion" and is considered a "Heavy" job in which an employee must be able to lift 100 pounds occasionally and up to 50 pounds frequently.  (Def.'s Ex. B at CXB0260, CXB0259.)  Additionally, the position requires the employee to be capable of eight hours a day of stooping, kneeling, bending, pushing, pulling, and standing, as well as four hours a day of lifting.  (*Id.* at CBS0259.)  Similarly, the job description for laborer states: "Work requires strenuous physical activity including frequent bending, stooping, crawling, climbing ladders, reaching and lifting heavy objects." (*Id.* at CXB0257.)  The position is considered a "Medium Heavy" job requiring an employee to be able to lift 75 pounds occasionally and up to 35 pounds frequently.  (*Id.* at CXB0255.)  As these job descriptions highlight, and Chance admits, he cannot carry out these jobs without accommodation.  Chance *does* claim that he could perform the job of fuel station attendant without accommodation, but this argument has no merit because the City has provided unrebutted evidence that fuel station attendant is not a job but rather one of the many duties of a Laborer.  *See infra* § III(A)(2) (discussing City's evidence that fuel station attendant is not a job within the City).

fact."). Moreover, Chance never proposed these accommodations to the City, despite the City's request that he do just that. (*See* Def.'s Ex. G at CXA0429.)

Furthermore, Chance's own vocational expert concludes flatly that he could "only perform work in the 'sedentary physical demand level' . . . but could not perform work in the light, medium, heavy or very heavy physical demand levels . . ." (Pl.'s Ex. 17 ¶ 5(D).) In short, at no point does Chance put forth evidence (other than his own speculative conjecture) that he could have performed the essential functions of an Automotive Maintenance Worker even with accommodation. He has thus failed to carry his burden, particularly in light of the job description, medical determinations, and Chance's general physical restrictions.[6]

## 2. Laborer

Chance also claims that he could have accomplished the essential functions of a Laborer if, as accommodation, the City had permitted him to continue manning the City fuel station. (*See* Pl.'s Ex. 28 ¶ 9.) But the City has put forth evidence, not rebutted by Chance, that there is no position of Fuel Station Attendant; rather, operating the fuel station is merely one of the many tasks required of a laborer. (*See* Def.'s Ex. B at CXB0256 ("THERE IS NO POSITION AS GAS ATTENDANT THIS IS A LABORER POSITION") (capitalization in original); Def.'s Ex. J ¶ 11 ("There is no position of 'Gas Attendant.' The duties of an employee working at the fuel station fall under the classification of Laborer.").) Chance baldly asserts that because the City let

---

[6] Even if Chance did put forth evidence that he could have accomplished the automotive maintenance worker job with a cart or assistance of others, it is arguable that he should be foreclosed from making any argument about reasonable accommodation. After all, Chance was specifically asked by the City what accommodations he believed might assist him in executing his job, and it is undisputed that he failed to respond. (*See* Def.'s Ex. G at CXA0429 (offering Chance the option of providing a "written list of worksite modifications, which would allow you to return to full duty").) He should not now, with the light of hindsight, an attorney, and an imagination, be permitted to hypothesize about potential accommodations.

him act as a Fuel Station Attendant for over a year, it was required to continue to allow him to perform in the position. However, the ADA and the Rehabilitation Act do not require that an employer restructure a job's essential functions as accommodation. For example, in *Champ v. Baltimore County*, 884 F.Supp. 991, 999 (D. Md. 1995), the disabled plaintiff had been allowed to work in a light-duty capacity for sixteen years even though internal regulations limited the allowable period of light-duty work to 251 days. Despite defendant's long-standing acquiescence in plaintiff's light-duty status, the court found that plaintiff had no right to continue in that status as a reasonable accommodation and thus dismissed the plaintiff's ADA claim. *Id.*

### 3. Fleet Quality Control Analyst

Chance also argues that he should have been accommodated by being transferred to the position of fleet quality control analyst. He alleges that he could have performed the job's essential functions and that he applied for a transfer to the position. (Pl.'s Rep. Mem. at 10–13.) But here, Chance misrepresents the record. He applied for the position in August 2002, before the second back injury and all of the events relevant to this litigation. (Pl.'s Ex. 9.) Additionally, in November 2002 (still before the second injury), Chance wrote to the City and stated that he was "delaying [his] interest in [the] position." (Pl.'s Ex. 29.) Although in the same letter Chance requested that his name "remain on the eligibility list until [he] can ascertain the needed information," he has submitted no evidence that he reactivated his application after this letter.[7] (*Id.*) Thus the fleet quality control analyst position is irrelevant because Chance did

---

[7] Chance does state, in an affidavit, that he "initially applied for this position, then delayed my interest in the position, but finally asked for my name to be kept on the list . . . and I asked to be further considered for the position prior to its being filled by the City." (Pl.'s Ex. 28 ¶ 8.) This is inadequate to rebut the evidence submitted on this subject by the City – namely, that by letter of November 6, 2002, Chance delayed his interest in the position and that the positions were filled that same month. (Pl.'s Ex. 29; Def.'s Ex. BB at 63–4.) *See supra* note 2 and accompanying text.

not apply for the job or request transfer at the relevant times.  Moreover, Chance has failed to show that there were vacancies for this position after his injury.[8]  Finally, the only evidence submitted on the topic shows that Chance could not perform the job's essential functions anyway; the job description indicates that the position requires a level of physical activity of which Chance is simply not capable.  (*See* Pl.'s Ex. 16 (noting that the position "requires moderate physical exertion including stooping, bending, and climbing to inspect vehicles").)

### 4.  Sedentary Administrative Positions

Finally, Chance claims he was qualified for various sedentary administrative positions within the City, including office assistant, data entry operator, word processing operator, and office supervisor.  (Pl.'s Cross-Mot. at 31.)  Yet Chance never applied for or requested transfer to these jobs, and first expressed interest in them in this lawsuit.  Apparently, Chance believes that the City should have, *sua sponte* and despite his failure to respond to the option letter and his decision to pursue disability retirement benefits and other specific job opportunities, transferred him to these positions.[9]  However, the City informed Chance that he had the opportunity to pursue other job opportunities and advised him to "[s]eek and recommend another funded vacant City position for which you qualify."  (Def.'s Ex. G at CXA0429.)  The letter further stated that if Chance chose to pursue this route, he should "do any or all of the following:

---

[8] The City has put forth unrebutted evidence that there were no vacancies in this position until well after Chance's termination.  (Def.'s Ex. BB at 63–4 (Q: Do you remember who it was that was promoted [in November 2002]? A: Yes . . . I think it's Joe Hicks . . . Michael Bradshaw and Kenneth Adamski. . . . Q: Do you know if anybody else has been hired into that position since these three in November '02? A: Yes . . . Raymond Hicks . . . I think it was in January [2007.]).)

[9] Chance asserts that he was qualified for these positions, and claims that the City does not dispute his qualifications.  (Pl.'s Cross-Mot. at 11.)  But the City admitted only that Chance was not *physically* incapable of performing the sedentary jobs at issue.  (Pl.'s Ex. 5 at 72–73.)  Nowhere does the City admit that Chance was qualified for these jobs more generally.

[visit the City recruitment center, have his name placed on lists with Human Resources, and/or contact the employment development office to discuss options.]" (*Id.* at CXA0430.) Chance failed to respond to this letter or to take any of the listed steps to pursue other jobs with the City.

Nevertheless, the City allowed him to pursue other jobs at his pre-termination conference, *at which time he expressed interest in only the automotive maintenance worker and laborer positions*, not these sedentary administrative positions now identified. (*See* Def.'s Ex. J ¶ 10.) Chance thus had several opportunities to indicate an interest in these sedentary administrative positions, and he failed to do so. Accordingly, these speculative jobs have no relevance to this litigation.

### IV.  CONCLUSION

In conclusion, there are no genuine issues of material fact in respect to whether Chance was a "qualified individual with a disability" because he was not capable of carrying out the essential functions of either the job he held or the jobs to which he sought transfer, with or without accommodation. His baseless and unsupported speculation concerning mechanical carts does not suffice to raise a genuine issue of fact, and the City is not legally required to create a new position as an accommodation. Additionally, the sedentary administrative positions were never raised during the period in question, and Chance cannot hypothesize about his potential suitability for those jobs merely to sustain this litigation. Thus, Chance has failed to make out a *prima facie* case of discrimination or failure to accommodate under the ADA and the Rehabilitation Act.[10]

---

[10] The Fourth Circuit has not laid out the elements of a *prima facie* case of failure to engage in an interactive process. Indeed, it is unlikely that the Fourth Circuit even recognizes such a claim. *See Walter v. United Airlines, Inc.*, 2000 WL 1587489, at *4 (4th Cir. 2000) ("[A]n employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process."). However, it seems

A separate order effecting the rulings made in this opinion is being entered herewith.


Date: December 5, 2007          /s/
                                J. Frederick Motz
                                United States District Judge

---

clear that even if the Fourth Circuit does adopt a freestanding claim for failure to engage in an interactive process, it will still be required that a plaintiff was a qualified individual with a disability.